May I proceed? Thank you, Your Honor. If it pleases the Court, my name is Elliot Shurker on behalf of the appellants. The District Court ruled that this can of Monster Energy Drink is so inherently distinctive as to be entitled to trade dress protection without a showing of secondary meaning in what is indisputably a very crowded field of energy drinks, many using dark and aggressive and edgy themes, and that this can would so likely be perceived by consumers as a Hansen Monster product as to be entitled to trade dress protection, and that, by the way, extends to the entire line of Monster Energy Drink products. Weren't there four cans at issue in this case? Am I wrong on that? Exactly. There are four different cans of Monster Drinks. There's Monster Energy, there's low-carb Monster Energy, there's Monster Assault, which is somewhat different, and there is Monster Chaos. And we are forbidden by the terms of the injunction from selling any products in cans that are similar to those cans or similar to these cans. We submit that legal errors require reversal of the preliminary injunction. First, because the District Court refused to give preclusive effect to a Nevada judgment against Hansen, which held that the Monster trade dress is weak and is limited to the word monster and the large claw-like M. Secondly, because neither the District Court nor Hansen ever defined the alleged trade dress with in the first instance. But the injunction, as I said, despite that lack of specificity, Judge Thomas, prohibits us from selling, and this is about ER 469, freak energy drinks in containers the same or similar to their, meaning our, current containers or any containers confusingly similar to plaintiffs' current Monster trade dress. I'd like to start with the collateral estoppel. Non-mutual collateral estoppel requires that the Nevada judgment be given binding effect. The District Court believed that it had discretion to decline to apply non-mutual defensive collateral estoppel. We submit that is a discretion that the District Court did not have. We have different products involved in the two cases, so that makes it a little more problematic, don't you think? Judge, our claim for non-mutual defensive collateral estoppel doesn't mean we win, because it was the Rockstar can, which is a somewhat different can. Our claim is simply that the District Court was required to give non-mutual, and your question goes right to the heart of it, non-mutual defensive collateral estoppel effect to the ruling that their trade dress has to be the same in every case. They can't have a different trade dress when they want to go after Rockstar and another trade dress when they want to go after us. The trade dress has to be defined with specificity for the claim to proceed in the first instance. The Nevada court ruled that their trade dress is M and Monster. And we contend that's defensive non-mutual. They had very much the same interest in defending, obviously, in Nevada. They had the same – the issues were the same, the stakes were the same. They don't contend there was anything unfair about those proceedings, which, by the way, are now pending before this Court on the summary judgment against them. The Supreme Court's Parkland decision and this Court's Keating decision, of course, recognize, as we say in our briefs, that when you're dealing with non-mutual offensive collateral estoppel, which is a totally different animal, the district court has to have discretion in determining whether or not to apply non-mutual collateral estoppel offensively. But we were defending. We were in the exact same position as was Rockstar in the Nevada case. And all we said was, we are entitled to invoke their loss against them, despite dependency of an entity stuck, if you will, with the definition of the trade dress. That's an M and the word Monster. The same issue was decided. What is your trade dress is the first inquiry in every trade dress infringement case. What are we dealing with? What are you claiming is protected? I realize that the appeal doesn't necessarily preclude you from making the argument, but given the pendency of the appeal, if this issue is the dispositive issue, shouldn't we wait for the other panel to decide the case? Well, Judges, you might expect we've given that a lot of thought. As you'll note from your file, we initially moved for a stay pending appeal. The Court denied the stay, but we're here before the Court in fairly short order because the Court expedited this appeal. This case is presently set for trial, I believe, in May in the district court. A decision on the legal issues in this case is obviously of importance to both parties, but I perfectly understand the logic. And in an ordinary case, it would certainly make sense because their trade ---- But you have economic damages that are ongoing that ---- Their trade dress is going to be their trade dress. And it should be the same trade dress when they're suing Rockstar as it is when they're suing National Beverage. And one thing that occurs to me is that the Court is inclined, in the Platters case, the two cases were consolidated. Yes. And the Court said, yes, we give preclusive effect, but we have both cases here. And in light of the exigencies of our case, if the Court would be inclined to do that, the only thing I could suggest is the Court might want to reconsider our stay application, and we'd be happy to brief it in light of the ---- in light of the pendency of the trial and the issues, because it would make some sense. Now, it is not the only legal issue in the case. Our essential point is that the Nevada court got it right and that there is no defined trade dress that, before you even address inherent distinctiveness, much less reasonable likelihood of confusion, is that they never did define their trade dress in a cognizable way. But that may also have implications, to be perfectly honest, as to the Rockstar appeal, which is, as I understand it, is personally unbriefed as of yet. And as I said earlier, their trade dress is their trade dress. And all persons in this market should be able to have the same trade dress to have to deal with in formulating their own package. And I gather that the Rockstar case has not been expedited, as far as you know? It is not. It's a final summary judgment against them. All right. I can't be out of question. Well, my question was whether you're talking about the rulings of the Nevada court that the trade dress was relatively weak and it was confined to the M and the monster. Are those rulings essential to the decision in Nevada? In other words, was Rockstar just so different that it really didn't matter what? Judge, a trade dress ruling is always the first step. We're not talking about anything beyond what is their trade dress. Now, the fact that their trade dress is weak and in a crowded market is going to be down the road to the question of likelihood of confusion, which for various reasons we submit was skewed by the discourse analysis in the first place. And before you can get the likelihood of confusion, you have to know what the trade dress is. But for the purposes of disposing of the very narrow question of what is this product that we cannot compete against in certain ways, it has to be clearly identified. And that's the same in every trade dress case. So that narrow ruling doesn't have anything to do with the infringing camp or the infringing object. Your trade dress is your trade dress. You have a right to a protection in what? They say in a lot more than monster and M, and I'll get to that in just a second, the Nevada court said M and monster, period. And of course, our product doesn't have an M. It doesn't have the word monster on it. So if their trade dress is limited to that, this case would have been on a very different footing in the district court. So our point, Judge Canby, is this was skewed from the outset by the refusal to apply the defensively, the Nevada court's decision. But even if that's not so, even if I'm not entitled to nonmutual defense and collateral estoppel, or if for some other reason the court believes that there was discretion, why did the court exercise its discretion not to apply nonmutual defense? It said the products are different. Stronger infringement in that, lack of infringement in that case. Various and untrue things, none of which have anything to do with what nonmutual defensive collateral estoppel is about. It's about, did you have a fair chance to defend? Was there any reason that you wouldn't have defended? Was there anything that's unfair? Even if it were used offensively, was there anything unfair about sticking you, so to speak, with the court's adjudication of what your trade dress is? And that wasn't the basis on which the court did it at all in terms of exercising its supposed discretion. All of that aside, the district court erred, we submit, in granting a preliminary injunction when there has never been, when there never was, and has yet to be a coherent definition of what the trade dress is. And, of course, that's required. We cite the Second Circuit's Uriman decision, which is a touchstone decision, as if you don't define what it is your trade dress is, you don't get beyond the first step. And how can you analyze distinctiveness when you don't have a distinct product? We cited the recent Northern District of California decision in our 20HA letter, the Walker and Zanger decision, which applies Uriman to hold just that. And the decision from the Sixth Circuit in the tumble bus case, I think, I think makes the point most clearly, and also answers the question of what had to be decided in Nevada, Judge Canby, although I'm perfectly happy to stand on my own merits without the Nevada case. A party must first identify what particular elements or attributes comprise the protectable trade dress. It will not do solely to identify in litigation a combination as trade dress. The discrete elements which make up that combination should be separated out and identified in the list. Now, we had a moving target in the district court. First, there was the complaint, which is at ER 21, in which Hansen said that it's the overall aggressive appearance of the can and the aggressive color scheme of the black or black and gray background, and one of four distinctive bright colors unique to each variety of Monster Energy Drink, which I showed you earlier. Then the court cited the claw logo, they cite rather the claw logo, the letter M in a jagged font that looks like a claw mark, and the word monster. Well, by the time of their reply on the preliminary injunction in the district court, and this is at ER 350, it was four elements. It was a black or black and gray background. No mention of green, and that's because if you look at ER 276 at the Nevada District Court's order, the court noted that they don't claim trade dress in the black and the green. A black or black and gray background, one of four distinctive bright colors unique to each variety, a clawed letter M, and the word monster in a font. The district court, at page 503 of the record excerpts, when the court identified it to hearing the elements of the trade dress, identified the so-called claw scratch font in the logo, the can's frightening Halloweenish image, which appears nowhere in any of their papers in which they don't appear to defend very vigorously on appeal, the three paragraph can story, the blurbs on the back of the can, and the use of the black and green can, which they disavowed trade dress protection as the product's trade dress. Now, on our reply brief at page four, we put together a little chart that shows the mutations, if you will, or the transmutations of trade dress. There's only one common element between all of Hansen's versions on the one hand of what the trade dress is and what the district court said the trade dress is, and that's the clawed like M. The district court didn't rely on the word monster, which even the Nevada court found. The district court didn't rely on the four color schemes. We submit this is unfair, that it's harmful to legitimate competition, to preclude producers from marketing their products when there is no precise definition. We rely chiefly, I think, on the Second Circuit's landscape forms decision, because what the court said is that without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult as the courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market. Exactly the position I submitted, which this court finds itself on this appeal. Courts will be unable to shape narrowly tailored relief if they do not know what distinctive combination of ingredients deserves protections. And this is perhaps the most interesting point. A plaintiff's inability to explain to a court exactly which aspects of its product designs merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme, or idea. Stated otherwise, you can't have inherently distinctive trade dress if you don't have distinct trade dress to begin with. Now, Monster and the claw-like M, these elements here, may indeed be protectable trade dresses. They strike me much as like the automobile logos, although not as famous, obviously, in this court's automotive gold case. But national beverages products use neither the M nor the word Monster. What we have is a black can with edgy and aggressive aura. We submit that is not the equivalent of the famous car logos in automotive gold. It is not the equivalent, for example, of the photographs of Marilyn Monroe on wine bottles in the Nova Wines case that we submitted with our 20HA letter. The remaining elements of the trade dress, to the extent they can be identified, are no different than the trade dress of any of the many products in this unique sub-market. We submitted extensive research and marketing material to show that in this drink market, everybody, and the picture tells the story far better than I can, everybody uses aggressive themes. You have names like Red Devil, and Red Jack, and Vamp, and all sorts of, and Buku, and all sorts of frightening looking images all over the cans. That is the market. And extending trade dress protection to such an ill-defined trade dress  in what is, by all accounts, a booming, a booming commercial market. We submit that in the absence of a clear, well-defined trade dress, they don't get past square one and the preliminary injunction should be reversed. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. John Skanga for the Apelli Hanson Beverage, and earlier this morning, there were arguments about fine art, the Van Gogh artwork, and here we're talking about essentially a form of commercial art, can graphics, and like the Van Gogh, extremely valuable to the plaintiff in this case. The evidence is undisputed that they spent over $100 million developing, promoting, marketing the brand. And similar to Van Gogh, very widely recognized. You might not know the artist, per se, but we had survey evidence submitted to the district court showing that over 60% of consumers, when they saw the can graphics with the word monster obscured, still recognized it as being a monster product. So there was argument that there was no secondary meaning evidence. That's not accurate. Judge Raffiti, though, did conclude that it was an inherently distinctive trade dress, and he did not abuse his discretion in ultimately deciding that a preliminary injunction was appropriate here. He applied the correct law on the preliminary injunction standard itself, on the sleek craft factors, which are analyzed in order to determine whether there is likelihood of confusion, and on the collateral estoppel issue as well, although we disagree on whether there's discretion to be applied there. The district court said, regardless, even if I were to be bound by the Nevada judgment, that will not affect my analysis. And that makes sense. The Nevada court said that there was protectable trade dress. It just said that there was weak trade dress. And what appellant's counsel just said is that even if the judgment were binding here, that doesn't win the case for them. They don't win on likelihood of confusion simply by showing that the trade dress is weak, the Nevada court. They characterized the Nevada decision as saying the only protectable elements are Monster and the M. We disagree with that, Your Honor. And I think that the actual decision by the Nevada court, which is in the excerpts of record at page 577, actually characterizes the trade dress as including not only the word Monster and the large claw-like M, and I'm referring to the very bottom paragraph here. This is paragraph number three. And the Nevada court actually refers not only to the word Monster and the M, but then goes on to discuss the colors, the color schemes of each of the products and refers to the black background and to each of the particular bright highlight colors. Now, what the Nevada court- Different colors. Doesn't say which colors. Right, although the pictures just above are color photographs of each of the elements, and it refers to the black-green color scheme, the blue-black color scheme, dark, the orange color scheme. Those are the highlight colors, the green, blue, orange, and red highlight colors, the same ones we were talking about before Judge Rafiti. In this case, so the Nevada court said that the trade dress was the overall image, including the colors, including the Monster, including the claw-like M, and noted, however, that the most prominent elements were the claw-like M and the word Monster, and went on to say, that's what the Rockstar 21 product doesn't have, according to Judge George in Nevada. He found that summary judgment was appropriate because he thought that the Rockstar was missing those elements. The common elements, the green and the black, he said, well, that's not protectable alone, and so that's the analysis that took place there, but it's the same trade dress that's being referred to here, and what we see the appellants doing is they want to parse it down into individual elements. Now, we've repeatedly said at the district court and in the briefing here what those elements are that make up the trade dress, but it makes up an overall image. You ultimately have to compare the overall commercial impression of the products. This isn't just a formula where we go down and check off a list and say, okay, black background, scratched out font, et cetera, and say, well, is it there? You ultimately need to look at the products and compare them as the consumers would because what we're doing here is we're determining what is the likelihood of consumer confusion. That's the ultimate analysis here, and so what the appellants want to do is they distract attention by focusing on subsets of individual elements and say, well, you can't get protection in just that one element, can you, or two of those elements, and they ignore the fact that we've articulated the four elements, and it's the overall image of those four elements that's what counts. Now, Judge Raffitti referred to it as a Halloweenish image. We call it an aggressive image. We don't think that one word, that shorthand buzzword is really critical in any sense. The picture does say a thousand words, and you do ultimately need to compare the products themselves and whether we've given it the right shorthand or not. The ultimate test is what is that commercial impression of those two sets of products, regardless of the shorthand buzzword that the lawyers want to give to it. But are you really trying to corner the market on the Halloweenish type of portrayal, whether it's a ghoul drink or a witch's brew or something like that, or would you say if they had pictures that were reminiscent of the horror films that you would seek protection, is that what you're really after here? Absolutely not, Your Honor. We're not saying it's protection on just some abstract concept or theme. What we're saying is that it is that image that we create made up by these specific elements. When somebody used the term Halloweenish, it seems awfully broad to me. Well, again... Aggressive. Right. I don't know what that means. Yeah, yeah. The... Maybe I know when I see it. The difficulty, and the, well, the difficulty is, I think, well articulated in the Scandia case. The problem becomes, as you try to articulate this overall impression with words, it becomes extremely difficult. And it's a slippery slope, because what it does is it creates loopholes for the enjoying party to say, oh, well, you know, my, I'm missing that one characteristic word, when, again, we need to go back and look at the overall impression of the products. And where I think you can take comfort, Your Honor, is that they have not been able to present evidence of anyone else in the marketplace who is any kind of player, who we've seen product on shelves in stores, who has a product that meets these definitions that we've set forth, that has the four elements, that has the same overall image, has the product line of four different products with the different highlight colors. And there was evidence below of the top sellers in the industry having much different looks. Red Bull, number one in the market. Silver and blue background. No monster imagery, no Halloweenish imagery whatsoever. No jagged font. None of those things in common. Rockstar, number three in the marketplace. Multiple products in their product line. The common element to them, a gold star with the letters RR, Rockstar. Background colors changing significantly between each of the different products. None of the jagged font. And that is the shortcoming of the argument that this trade dress has been defined too broadly or somehow indefinitely. If that were the case, then like in some of the cases that they pointed to, for example, that Walker's Anger decision that they submitted last week, a Northern District decision, the risk that the trade dress owner has when the trade dress owner defines broadly and vaguely, he casts the net too wide. Begins to encompass the rest of the world. And in that case, it was a tile design. And they said, well, it evokes an old world feel. It has colors reminiscent of being in Provence, France. Well, lots of other people were doing it. It had an old world feel, the court said, because people have been making tile that looks like this for centuries. And there were at least eight competitors admitted to be selling tile lines that were in this same thematic category. And those cases where the trade dress owner really has struggled in those cases that have been cited, Landscape, Forms, Yearman, Walker's Anger, those are product configuration cases. The Supreme Court in the Walmart v. Samara case said the standard for trade dress protection for a product configuration as opposed to a package. And what we're dealing with here is the can. It's the package, not the liquid. They can sell whatever beverage they want and whatever color they want it to be. And that's not our issue here. But when you're talking about the package itself, that's where you start to implicate these competitive concerns. Are you, through trade dress law, I'm sorry, when you're trying to protect the product, the shape of the product, through trade dress law, you now run the risk that if you define too broadly, you really are excluding people from selling a competitive product, a piece of jewelry, as in Yearman, an outdoor bench, as in the Landscape case, a type of tile, as in Walker's Anger. Here, they're free to sell energy drink. In fact, they had a very successful Rippit line of energy drinks that they were free to sell. And Judge Rafiti was presented with a case where the equities were very strong. The product, this Freak product, had only been on the market for a matter of weeks when we brought our motion. They were about to expand nationally, go to a trade show and go from a single marketplace in Detroit where they had test marketed the product to go nationwide. And we were able to bring the motion in advance of that and present evidence that they were a very large company that, within weeks, could have redesigned different graphics and come out with another energy drink that they could have used. And so the risk of injury to them was extremely low, whereas Hansen, as I mentioned before, this has been a very successful product for them. They have invested very heavily in developing the brand image. And we're seeing instances of actual confusion already when the product had only been on the market for weeks. And part of that was fueled, in part, by the Freak cans actually being placed in the same racks in the shelves in the convenience stores, in the racks that were labeled Monster. So you have not only the same background colors, the same highlight colors, you've got an actual picture of a monster. They call it a Freak, but it's hard to imagine that Judge Raffiti could have been clearly erroneous in concluding that that image is of a deformed face, that that is an image of a monster. They've got the name Freak, which they don't dispute, synonymous with Monster. They even refer- You're starting, if you have a monster written on your can, does that mean nobody can come out with a King Kong drink or something like that? Because there's suddenly, that can be a monster, too? I mean, how far do you carry the synonym business? Well, Your Honor, I think, again, I need to see the overall can. However, we're not saying that the monster alone is enough. In our definition of the trade dress, we have said it is the monster plus the clawed out font, plus we've got the word monster written in a very unique white font with a silver outline, plus this black background. So it may well be possible to design a can with a King Kong on it, which differs in enough ways that it would not be confusingly similar. The decision by Judge Rafiti says that they're enjoined from selling the monster trade dress and anything confusingly similar with it. And there's really no question that the monster trade dress was our four cans in our line with the definition of those elements. And I don't think there's any support from the record to say simply having a scary image is enough to be either anything that Hanson ever argued was alone with their trade dress or that that's what's encompassed by the injunction itself. Well, Judge Rafiti says the cans, he uses the term, the cans frightening Halloweenish image in describing what he thinks is the trade dress. He mentions that, Your Honor, and again, we have the issue of can you say in one or two words what the overall image is. But secondly, the context of that statement. I'm not going to interrupt, but don't you have to at the end of the day when you have an injunction to be able to say this is what you can't do. You can't just say we have an image and we can't describe it, but you're prohibited from copying it. Well, Your Honor, I think that you have to look at the injunction in light of the proceedings that led up to it. I don't think that in a vacuum, when the injunction says you're enjoined from selling the monster trade dress, that I think it's perfectly appropriate to look at the briefing that led up to that. And look at how Hanson characterized that trade dress or how Judge Rafiti characterized that trade dress and determine that that's what they're enjoined from doing. And here, there's really no question. They have the freak cans that they were selling at the time of the injunction. They know they're enjoined from that. And two interesting things that I want to point out. One is, at no point did National go back to Judge Rafiti and say, we don't understand your injunction. We don't understand the scope of it. You said the monster trade dress. We don't know what that means. And they didn't do that. And they didn't do that in their emergency motion to this Court for stay. And if Judge Rafiti were to somehow be disagreeing with us, if he were to be recasting the trade dress to be something different than what we had articulated, you would certainly expect that in a case where the characterization of the trade dress was in dispute with the district court, you would expect that Judge Rafiti would be quite specific in saying, I disagree with this characterization. I think it should be this. In fact, I think it would be a little bit surprising for the judge to say, plaintiff, I don't like the way you've articulated your trade dress. I'm going to now recast your pleadings for you. So if you were to define it succinctly, how would you define your trade dress? Exactly as we've done in the briefing here, Your Honor. It's that overall aggressive image. It's formed from the black or black and gray background of the can. It's formed from the clawed out M in a bright highlight color, one of four highlight colors for each of the four lines. And we know what those colors are. It's the word monster. And it's the word monster written in this unique font. It's a white font with a silver outline. And I say it's a unique font because it's not something like a Times New Roman font. It's a hand-drawn kind of font. And it's those elements put together creating that overall commercial impression. And when we look at the Freak can, far more concordance between the Freak can and any other product that they've been able to point out on the market. Far more similarity between the Freak lineup of cans and monster than anybody else. They have the image of the monster. In your brief on page one, three out of four of your cans don't have this gray background. It's black or black and gray, Your Honor. The ones, some are solid black. Two of them are solid black. And two of them are kind of a speckled, a black and gray mixture. That's the two background options. And the Freak has exactly that, the black background. It has the word Freak written in a clawed out font. The word Freak means monster. We have the image of the monster. And then they have these other words, rage, psycho, maniac, on each of the cans. Those are written in a hand-drawn kind of unique white font with silver outline. And the actual confusion evidence is, I think, quite instructive here. This is not just attorney argument that this is likely to be confusing. We had evidence of actual confusion and declarations submitted to that effect at the district court. And what we're seeing the appellants do is, again, they raise arguments which they raised below or should have raised below. But they don't really deal with the countervailing evidence that we presented. And they don't really explain how Judge Rafiti erred. They don't explain how it was a clear error for him to have weighed our evidence and come to the conclusion that he did in going through each of those sleek craft factors and concluding that there was a showing of likelihood of confusion. And, again, in light of the preliminary injunction standard, we only need to show probable success or a strong question on the merits. When you look at those equitable factors, there's really been no dispute that this was a very valuable trade dress to Monster Hanson. And the defendants had just begun to use it. We were really nipping them in the bud. And in light of the confusion that was taking place, the hardships were far greater to Hanson if the Freak product were to be continued to be sold and continued to be confused than it would have been for National to be enjoined when, again, they had other perfectly acceptable alternative energy drinks that they could have sold and, in fact, were selling at the time. How much of a showing of confusion has to be made? I mean, some people are going to get confused no matter what. You know, our national elections show that. People think they're voting for one thing and vote for another. The fact that a few people can't tell the difference between these can't, what do you have to show? Well, Your Honor, I think what we have to show has to be weighed in light of the stage of the proceedings. And I think for a preliminary injunction filed on the day the action was initiated and filed literally within a few weeks of the Freak product being introduced in just one market. So we have a very limited subset of potentially confused consumers. We think that any actual confusion showing at that stage in the proceedings is quite persuasive. Now, that might be a different standard when we were, if we were at trial and the product had been on the market for many months and had been distributed in a much wider spectrum. But at the stage that we were at, we had one declaration from somebody who worked in a retail store. So not just a consumer who was mixed up, although a mixed up consumer is exactly what we're trying to prevent against. But it was somebody who was in the business, who worked in a store, who sold energy drinks. And that person believed that there was some affiliation between us. So I think when you're at that retailer level and there's confusion, I think that's extremely persuasive. And we... Or you could say that the evidence is that the strength of the trade dress is, well, it's a weak trade dress. That's the other possibility. That likelihood of confusion occurs because there's not a strength, a strength of identification with this trade dress. Well, if that were the case, though, Your Honor, then I would think you'd be confused into thinking it was affiliated with somebody else. We may not have particularly broad rights because in the Nevada case, we were talking about really the entire beverage market, alcoholic beverages, energy drinks. Even the district court there was referring to non-energy drinks, just regular soda drinks. So within our niche, within this niche of energy drinks, we feel we have very strong rights. But even if they are weak, again, Judge Raffitti considered that fact. And he said, in light of the very overwhelming similarities between Freak and Monster and the background history of the defendants knowing that we were changing distributors, they wanted to go to the former distributors and try to fill their inventory with a Monster substitute and promoting the product side by side on the same shelves. That showed that. Is that, yeah, where does that figure in? Because if the cans weren't similar, putting them in a Monster rack may be some other kind of a violation, but it wouldn't be an infringement on trade dress. Well, Your Honor, I think it goes. Is there a competition or something? It may well be that also. But in the Sleecraft analysis, the intent of the infringer in adopting the mark is a factor. And if you can show that they're in. Market channels, too, I suppose. Absolutely identical market channels, literally same stores, same customers, same price, same racks, same shelves. But also it goes to show that the defendant was seeking to capitalize on Hansen's goodwill. They were deliberately trying to step into our shoes at the distributor level and then at the retail level. And then even from the, obviously, the overall impression being that which they wanted to evoke the same impression as us. And so those kinds of factors, those different eight Sleecraft factors were all considered by Judge Raffitti. There was evidence supporting his conclusions in our favor on all of those. And we think that the ultimate issue here, the ultimate problem that the appellants are raising, is simply that the likelihood of confusion standard is going to always leave a little bit of gray area, that we just cannot define in an order with mathematical precision exactly what elements, what changes are you permitted to make. There is an overall image, we're creating this picture, and in words, in a preliminary injunction order, it's not realistic to expect it to be in so much detail that they will know exactly what changes they need to make to avoid infringement in the future. And it's their obligation to stay a safe distance. Once a judge is to be infringing, they have an obligation to stay a safe distance away. And the net result is that they have to live with that order. And any order that gets crafted, you can always find at the penumbra some area where you can say, well, it's not quite certain what I can or cannot do here. So we think Judge Raffitti was well within his discretion in light of the entire background, the equitable factors, and the similarity of the products, and we urge affirmation. Thank you, counsel. If it pleases the court, I think the most revealing thing that Mr. Skanga said in response to a question from the court as to the specificity of the injunction is that the party should look at the proceedings, look at the complaint, look at all the papers, and determine from all of these extraneous materials exactly what the injunction means. And the last thing he said is, it's impossible to do this. There's always going to be gray areas. He's simply wrong. As McCarthy says, and it's cited in our brief in Section 8.3, an injunction against trade dress infringement must be specific and list in detail the elements which make up the protected trade dress and which the defendant cannot use in combination. Now, Mr. Skanga also said that he has rights in the overall impression created by his product, and that should be enough for us. And by the way, every other would-be entrant into the market or current player in the market who is not, it's not only, it's not only national beverage that's going to have to make gigantic commercial decisions based on what the trade dress protection is, it's everybody else who would be in the market or who currently is in the market. So McCarthy continues, an injunction which broadly forbids the defendant from making or selling a product which uses the, quote, same overall appearance as plaintiff's trade dress, does not comply with Rule 65D's requirement of specificity. Now, what Mr. You're reading from I'm reading from McCarthy on trademark, and we cited the other cases in our briefing. I'm sorry, Renner. No, so in this case, if we had a, if you think that Judge Raffiti should have crafted more specifically, of course, that's one remedy. And I gather if you, even though you disagree with his conclusions, what you believe he should have said is the claw and monster are the trade dress at issue, right? We believe that's the most to which they'd be entitled even without the Nevada judgment. And the reason they don't want to that is because we can't possibly, no, no reasonable judge or jury we believe would find us guilty of infringing on an M and the word monster. By, and I think you heard some argument about word picture equivalency, and Judge Canby, you asked a question about putting King Kong on a can. That's exactly what we've done, is to put King Kong, a fanciful King Kong on our can without ever using the word monster. And if I recall the Pegasus case correctly, it's cited in our brief, the law is that word picture equivalency is a question of fact. And, and that was never, that was never resolved or tried in the district court. That because, because the district court's order, I think the most compelling proof that the district court's order is overly broad is that Mr. Scangle wants to retry it here and talk about word picture equivalency and talk about reasonable likelihood of confusion. Until you have an identified trade dress, you can't even decide inherent distinctiveness. You don't decide reasonable likelihood of confusion because everything starts with that in which you have the rights. And because they can't define that in which they have the rights, they talk about possible confusion in this very small area of Gross Point, Michigan, in our test, in our test market. And they say any likelihood of confusion should suffice. But we don't even know what we can't make. And no one else, no one else in the market knows what they can or can't make. And I believe I heard, I believe I heard the argument that, that we're trying to break the trade dress down and, and trade dress has to be considered as a whole. Well, we know that and, and we've argued that in our brief. But the case that we think answers that question most clearly is the Kendall-Jackson case from this Court. Because what this Court ultimately held in Kendall-Jackson was that while the, the, the little grapes on, on Kendall-Jackson's wine bottles might be entitled to trade dress protection, almost exactly like the M on, on, on the can. All the other things about the bottle in which Kendall-Jackson wanted to assert rights, the way the shoulders were, the way the cork was. What the Court said was, was this created the California look in, in, in, in wine bottles. And that while Kendall-Jackson, the, the one piece of it that Kendall-Jackson could assert rights in, the, the, the, the little grapes was only a small component of the overall trade dress in which they were asserting protection. It would have kept Gallo out of the market for making wines that looked like they were, that, that had the California look. And the Court said, no, that's exactly the situation. They may be able to assert rights in the M. They may be able to assert, assert rights in the word monster. But they cannot take this overall impression of black and gray and, and, and, and, and Judge Canby, you asked about the different kinds of cans. That's exactly right. One of the cans has, has camouflage on it. And they have different shades of black and gray. Now, they talked about the colors. It's interesting, Judge Rafiti did not rely on the colors because what, as we point out in our briefs and as we pointed out at the hearing, the colors indicate the flavor of the drink. They're no different than, than red for strawberry and sodas or, or, or, or greenish, whatever that color is for, for lemon lime sodas. That's what the colors are for. The colors are completely functional. And that's what the Supreme Court taught us in the Qualitex decision, of course, is that, is that, that colors are not going to be entitled to trade dress protection. That's why they dropped the, the, the black and, and, and, and green argument that, that, that they, they seem to be trying to resuscitate here. What they're left with is an edgy overall look. And whether you call it Halloweenish or you call it edgy, no one in the energy and drink market is going to know that which they cannot do without facing a lawsuit from these folks over here. That's what they did wrong. That's what the district court did wrong. And they don't have to get any further. The case cannot go any further and should be reversed. Thank you. Thank you, Counselor. The case is, the argument will be sent for decision. Thank you, Your Honor. And we will hear the case of United States v. L. Batwari. All right.
judges: Canby, Thomas, Conlon